[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 5, 2007
THOMAS K. KAHN
CLERK

No. 05-10143

_____

D.C. Docket No. 02-61161-CV-FAM

JEFFREY J. THOMPKINS,

Plaintiff-Counter-Defendant-Appellant,

versus

LIL' JOE RECORDS, INC.,
LIL' JOE WEIN MUSIC, INC.,
JOSEPH WEINBERGER,
JOHN DOE, individuals and corporations,

Defendants-Counter-Claimant-Appellees,

NAVARRE CORPORATION,

Third-Party Defendant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(February 5, 2007)**

Before TJOFLAT and KRAVITCH, Circuit Judges, and LAWSON,* District Judge.

TJOFLAT, Circuit Judge:

This appeal requires us to consider what happens when a debtor-in-possession in a Chapter 11 bankruptcy case, who negotiated the purchase of copyrights prior to the bankruptcy proceeding, later uses the bankruptcy code to reject those contracts that transferred ownership of the copyrights to the debtor. Our resolution of that question determines the outcome of much of this suit by a rap artist who created the works giving rise to the copyrights in question. The artist sold copyrights in his works to a music recording company in exchange for a recording contract that entitled the artist to future royalties. The recording company later went bankrupt, becoming the debtor-in-possession. In confirming the debtor's reorganization plan, the bankruptcy court ordered that all of the debtor's contracts with the artist be rejected under the bankruptcy code and the copyrights sold to a rival recording company and its owner, two of the defendants in the instant case.

Years later, the artist sued the defendants, alleging that they did not actually gain ownership of the copyrights through the bankruptcy, or if they did, they now

---

* Honorable Hugh Lawson, United States Chief District Judge for the Middle District of Georgia, sitting by designation.

owe him royalties. Based on that premise, the artist asserts numerous claims sounding in federal and state law. The district court granted summary judgment in favor of the defendants on all claims, and for the reasons set forth below, we affirm.

## I.

The pertinent facts span a period of seventeen years. We recount first the history of the artist's business dealings with the debtor-in-possession, then the bankruptcy court's administration of the debtor's reorganization, and finally the proceedings leading to this appeal.

## A.

Jeffrey J. Thompkins ("Thompkins") is a rap artist who performs individually under the name "JT Money." As teenagers in the late 1980s, Thompkins and a partner were discovered at a Miami talent show by a member of the somewhat notorious South Florida-based rap group 2 Live Crew. Another member of 2 Live Crew, Luther Campbell ("Campbell"), owned a number of variously named record labels and was in the business of developing new artists. In May 1989, Campbell signed Thompkins to an Exclusive Recording Agreement (the "1989 Agreement" or "Agreement") with a predecessor company to

Campbell's Luke Records, Inc. ("Luke Records").[1]  Under the 1989 Agreement,

Thompkins would record albums under the group name "Poison Clan."[2]

The Agreement covered a contract period of five years.  Under its terms,

Thompkins was required to record and deliver master recordings ("masters") for

production and release by Luke Records.  Luke Records was given "exclusive,

unlimited and perpetual rights throughout the world" to the copyrights "in sound

recordings (as distinguished from the musical compositions embodied thereon)

recorded by ARTIST during the Term."  Thompkins also granted Luke Records a

license for "[a]ll musical compositions or material recorded pursuant to this

Agreement which are written or composed . . . or which are owned or controlled,

directly or indirectly, in whole or in part, by ARTIST and/or . . . any producer of

the masters subject hereto."[3]  In exchange for its ownership of the sound recording

---

[1] The predecessor company that signed Thompkins was Effect Records, a division of Campbell's Skyywalker Records (which later became Luke Records).  These and all of Campbell's other various music business entities relevant here ultimately fell under the ownership of Luke Records or Campbell individually.  For ease of reference, we refer collectively to all of the Luke Records and Campbell music recording and publishing entities as "Luke Records."

[2] "Poison Clan" originally referred to both Thompkins and his original partner, Patrick Watler.  Thompkins and Watler were both parties to the 1989 Agreement, but in July 1992, Watler apparently decided to perform with a different group and signed a letter purporting to release any interest he had in Poison Clan.  Watler's involvement with Poison Clan is not at issue here.

[3] Thompkins also obliged himself to obtain a license on Luke Records' behalf for any compositions that Thompkins did not himself own or control.

copyrights and its license to exploit the musical compositions, Luke Records agreed to pay Thompkins royalties according to specified rates. The Agreement obligated Luke Records generally to "commercially release each LP [album] recorded and delivered" by Thompkins under certain conditions, but specified:

> [Thompkins] acknowledges that the sale of records is speculative and agrees that the judgment of [Luke Records] with regard to any matter affecting the sale, distribution or exploitation of such records shall be binding and conclusive upon [Thompkins]. Except [for the general provision requiring Luke Records to release completed albums], nothing contained in this Agreement shall obligate [Luke Records] to make, sell, license, or distribute records manufactured from masters delivered hereunder.

In addition to the 1989 Agreement, the validity of which neither party disputes on appeal, the record contains a number of other documents that appear to be contracts between Thompkins and various parties. Several of these suggest that, after the 1989 Agreement was signed, Thompkins in fact signed away to Luke Records all or part of his copyrights in the musical compositions embodied on his albums.[4] Among these documents is an addendum to the 1989 Agreement, dated February 1992 (the "1992 Addendum" or "Addendum"), transferring to Luke Records "an undivided 50% of the publishing interest, in all compositions of [Thompkins] including without limitation, the copyrights therein and all renewal

---

[4] Some of these purported agreements were technically between Thompkins and Pac Jam Publishing ("Pac Jam"), Campbell's music publishing company. Pac Jam was also disposed of as part of the Campbell bankruptcy, so we include it when we refer to "Luke Records."

5

and or [sic] extensions throughout the world." In exchange, the Addendum recites that Thompkins is to receive, among other things, cash advances for each album and the entire royalty to which Poison Clan was entitled under the 1989 Agreement regardless of any future addition of other members to the group. Thompkins signed the Addendum, which also has an unsigned blank for a signature on behalf of Luke Records "By: Luther R. Campbell, President."

Other documents pertain to Thompkins's work as a "sideman" on certain compositions and recordings created by Campbell, who performed as a solo artist in addition to performing with 2 Live Crew and managing his music production business. These one-paragraph letter agreements ("the Sideman Agreements") set forth Thompkins's compensation for his contributions to certain of Campbell's solo works.[5] In slightly different language, each of the Sideman Agreements provides that the specified royalty rate and/or lump sum payment represents Thompkins's payment in full for his services on the listed songs and that he "will receive no other royalties" or "no other monies." The Sideman Agreements do not explicitly reference the ownership of any copyrights in those works.

From 1989 through 1994 (the year in which the 1989 Agreement expired by

---

[5] The Sideman Agreements are dated April 27, 1990; December 1, 1991; May 21, 1992; and February 11, 1994. Each covers between one and four songs by Campbell.

its terms), Thompkins recorded three albums as Poison Clan: <u>2 Low Life Muthas</u>, <u>Poisonous Mentality</u>, and <u>Rufftown Behavior</u>. Luke Records distributed each of these.

B.

On March 28, 1995, Luke Records became the subject of an involuntary Chapter 7 bankruptcy petition filed by its creditors in the U.S. Bankruptcy Court for the Southern District of Florida. That June, Campbell individually filed a voluntary Chapter 11 bankruptcy petition, and Luke Records moved to convert its Chapter 7 case into one under Chapter 11. The bankruptcy court granted Luke Records' motion on June 14, 1995 and jointly administered the Luke Records and Campbell bankruptcies.[6]

On November 22, 1995, Thompkins filed a proof of claim in the Luke Records bankruptcy for an unspecified amount owed to Poison Clan based on "Services performed" and "Royalties Due – Record & Copywright [sic]" from the period "1989 to 1994." In deposition testimony taken in the course of the instant case, Thompkins admitted that the address he listed on the proof of claim form

---

[6] Although the bankruptcy court administered the two cases jointly, they were maintained as separate cases on the bankruptcy court docket. The two case designations were <u>In re Luke Records, Inc.</u>, No. 95-11447 (Bankr. S.D. Fla.), and <u>In re Luther Campbell</u>, No. 95-12785 (Bankr. S.D. Fla.).

was his residence at the time and that he did, in fact, receive notices at that address regarding the bankruptcy case.[7]

The bankruptcy cases continued throughout the following months, and by mid-February 1996, Luke Records, Campbell individually, and the Official Unsecured Creditors' Committee in the Luke Records bankruptcy had tentatively agreed upon a Joint Plan of Reorganization (the "Joint Plan" or "Plan") for the two debtors. The Joint Plan provided for the classification and treatment of all claims in both bankruptcies, specifying that after confirmation by the bankruptcy court, "all of the provisions of this Plan, including all appendices and other exhibits hereto, shall be binding on the Debtor, the Estate, all Creditors, and all other entities who are affected (or whose interests are affected) in any manner by the Plan." A Letter of Intent annexed as "Exhibit A" to the Joint Plan specified the proposed terms of the Plan's execution.

Under the Letter of Intent, the various Luke Records entities (including Luke Records, Inc., Pac Jam, and Campbell individually) proposed to convey a

_____

[7] On February 12, 1996, the Official Unsecured Creditors' Committee in the Luke Records bankruptcy filed an objection to various claims, including Thompkins's. The committee asserted that Thompkins's unliquidated claim was "pursuant to [an] executory contract" and should be "disallowed and held in abeyance" pending Luke Records' decision on whether to accept or reject executory contracts. There is no evidence in the record that Thompkins responded to the committee's objections or took any other action with regard to the bankruptcy cases.

number of specified assets to Lil' Joe Records, Inc. and its owner, Joseph Weinberger ("Weinberger"). The assets were to be transferred "free and clear of any and all liens, claims, encumbrances, charges, setoffs or recoupments of any kind, except as noted hereinbelow." The assets to be conveyed included "[a]ll worldwide rights to the masters . . . owned or controlled by Luther Campbell or Luke Records" and "[a]ll worldwide copyrights and/or publishing interests held by Luther Campbell, Luke Records, Inc., or Pac Jam Publishing," except with regard to certain other artists not at issue here. Under the agreement, Campbell and Pac Jam would "receive no royalties, whether as artist, producer, writer, publisher, or in any other capacity, on any of the masters or compositions being sold." In exchange, Lil' Joe Records, Inc. and Weinberger agreed to pay a total of $800,000 to the two bankruptcy estates.

The Joint Plan and Letter of Intent also provided for the disposition of executory contracts to which Campbell or Luke Records were parties. The Joint Plan established as a default that any executory contracts not otherwise explicitly disposed of were to be deemed rejected pursuant to 11 U.S.C. § 365 (again, with certain exceptions not relevant here).[8] The Letter of Intent proposed that "Luke

---

[8] Section 365 provides in relevant part that "the trustee, subject to the court's approval, may assume or reject any executory contract . . . of the debtor. . . . [T]he rejection of an executory contract . . . of the debtor constitutes a breach of such contract . . . immediately before

9

Records . . . shall assume and assign to [Lil' Joe Records, Inc. and Weinberger], in [Weinberger's] sole discretion, . . . all existing artist and producer contracts to which Luke Records or its affiliates and subsidiaries is a party with Poison Clan." (Emphasis added.) Both the Joint Plan and the Letter of Intent provided that their terms were subject to an order of confirmation by the bankruptcy court.

In the interim between the filing of the Joint Plan and the bankruptcy court's confirmation order, the disposition of executory contracts remained an unresolved issue in the bankruptcy. On February 16, 1996 – the same day on which the Joint Plan was filed – Luke Records filed a motion pursuant to 11 U.S.C. § 365 to determine its ability to assume and assign various contracts it characterized as executory, including "Debtor's Exclusive Recording Agreement with: Poison Clan." According to the motion, "[a] material provision of [the Joint Plan and Letter of Intent] will be the assumption and ultimate assignment of the executory contracts described" to Lil' Joe Records, Inc. and Weinberger. Apparently, however, in the weeks that followed, Weinberger thought better of that aspect of

the date of the filing of the petition[.]" 11 U.S.C. § 365(a), (g). Although the statute speaks of assumption or rejection by "the trustee," decisions to assume or reject executory contracts under § 365 may also be made by a debtor-in-possession by operation of 11 U.S.C. § 1107(a), which generally authorizes debtors-in-possession to perform the same functions as a trustee. Sipes v. Gen. Dev. Corp. (In re Gen. Dev. Corp.), 177 B.R. 1000, 1011 (S.D. Fla. 1995), aff'd sub nom. Sipes v. Atl. Gulf Cmtys. Corp. (In re Gen. Dev. Corp.), 84 F.3d 1364, 1365, 1373–74 (11th Cir. 1996). It appears that in both the Luke Records and Campbell bankruptcies, the debtors were operating under § 365 as debtors-in-possession.

the Plan, opting instead to exercise the discretion given to him in the Letter of Intent and direct Luke Records to reject the contracts. On March 21, 1996, the bankruptcy court entered an order withdrawing without prejudice Luke Records' motion to assume and assign the contracts; setting the confirmation hearing date as the intended deadline for any other motions to assume executory contracts; and reiterating that "[a]ny contracts not assumed will be deemed rejected."

On March 22, 1996, the bankruptcy court approved and confirmed the Joint Plan and Letter of Intent, ordering that "the parties are authorized and directed to perform thereunder" ("the Confirmation Order"). The order recites various findings required for plan confirmation under 11 U.S.C. § 1129, including that the Joint Plan was proposed in good faith, that it complied with the applicable provisions of the bankruptcy code, and that "[t]he sale of Debtors' assets to Joseph Weinberger and Lil' Joe Records, Inc. . . . pursuant to the terms of the Plan and the Letter of Intent is in the best interest of each of the Debtors' estates. . . . [Weinberger and Lil' Joe Records, Inc. are] independent third-party purchaser[s] and the Letter of Intent was negotiated in good faith and at arms'-length." Among its specific mandates, the Confirmation Order provides:

> [A]ll executory contracts and unexpired leases of the Debtors are hereby rejected pursuant to Section 365(a) of the Bankruptcy Code. Parties to such rejected contracts and leases are directed to file proofs of claim for rejection

11

damages . . . or be forever barred from asserting such claims. . . . All of the assets to be transferred under the Plan, the Letter of Intent or this Order shall . . . be transferred free and clear of any interest in such property of an entity other than the Debtors.

Following the plan confirmation, the bankruptcy court issued orders in both bankruptcy cases setting bar dates for claims arising from rejected executory contracts. The order in the Luke Records bankruptcy, issued on April 4, 1996, provided that "[a]ll of the Debtor's executory contracts . . . , including those exclusive recording contracts known to the Debtor shown on Exhibit 'A' attached hereto and incorporated herein by reference . . . are rejected." The first artist listed on "Exhibit A" was Poison Clan. Parties to the rejected contracts were allowed thirty days to file "any claims arising as a result of such rejection," and claims not timely filed were to be "deemed waived and will not be entitled to distribution under the confirmed Joint Plan." Thompkins did not file any proof of claim for rejection damages.

As a final step in the reorganization process, the parties executed the various transactions required under the Plan. Among these was a copyright assignment to Lil' Joe Records, Inc. of "all of [Luke Records', Campbell's and Pac Jam's] portion of all rights, title and interest set forth in and to the musical compositions, comprising 100% of all worldwide rights owned by [Luke Records,

Campbell and Pac Jam] . . . including but not limited to the lyrics, music, and title of the compositions, and any and all works derived therefrom, together with the copyrights and proprietary rights therein." The copyright assignment was executed on April 8, 1996.

## C.

Nearly six years later, on March 5, 2002, Thompkins filed the instant suit against Lil' Joe Records, Inc., Lil' Joe Wein Music, Inc., and Weinberger (hereinafter collectively, "Lil' Joe") in the U.S. District Court for the Northern District of Georgia seeking damages, declaratory relief, and permanent injunctive relief for alleged violations of the Copyright Act, 17 U.S.C. § 501, Lanham Trademark Act, 15 U.S.C. §§ 1114, 1125, and state common law contract claims. Later that year, the case was transferred to the Southern District of Florida, where Thompkins filed an amended complaint on November 7, 2002 adding a claim of fraud under Florida common law. The parties conducted discovery and filed opposing motions for summary judgment. On March 16, 2004, after a hearing on the motions for summary judgment, a magistrate judge issued a report and recommendation that both motions be denied. Lil' Joe objected to the magistrate report. On December 7, 2004, the district court declined to adopt the report, granted Lil' Joe's motion for summary judgment on the ground that the earlier

13

bankruptcy Confirmation Order precluded Thompkins's claims, and denied

Thompkins's motion for summary judgment.  The district court entered final

judgment for Lil' Joe on December 16, 2004.  Thompkins now appeals,

challenging the district court's order granting Lil' Joe's motion for summary

judgment.

II.

We review <u>de novo</u> a grant of summary judgment, applying the same

standard as the district court and reviewing all facts and reasonable inferences in

the light most favorable to the nonmoving party.  <u>Calhoun v. Lillenas Publ'g</u>, 298

F.3d 1228, 1232 (11th Cir. 2002).  Summary judgment is proper when "there is no

genuine issue as to any material fact and . . . the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The district court granted summary judgment in favor of Lil' Joe on the

ground that the bankruptcy court's Confirmation Order precluded all of

Thompkins's claims in the district court.  Neither the parties nor the district court,

however, refer to the precedent of this circuit governing the preclusive effect of

bankruptcy orders in subsequent collateral litigation.  <u>See, e.g.</u>, <u>Eastman Kodak

Co. v. Atlanta Retail, Inc. (In re Atlanta Retail, Inc.)</u>, 456 F.3d 1277 (11th Cir.

2006); <u>Kaiser Aerospace & Elecs. Corp. v. Teledyne Indus., Inc. (In re Piper</u>

14

Aircraft Corp.), 244 F.3d 1289 (11th Cir. 2001); Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.), 898 F.2d 1544 (11th Cir. 1990). We think it less than clear whether the Confirmation Order precludes altogether Thompkins's claims in this case, but we find it unnecessary to enter that thicket in our review. The essence of the parties' quarrel on appeal is how certain assets were disposed of in the bankruptcy; both Thompkins and Lil' Joe now contend that the bankruptcy reorganization gave them ownership over these assets or other collateral rights. Although both parties couch their arguments in terms of "res judicata," their dispute is not simply whether Thompkins's claims were precluded before he even came through the courthouse door to file the instant complaint. Instead, this case depends upon the substance of the bankruptcy reorganization of Luke Records.

Accordingly, we decline to re-examine the grant of summary judgment on preclusion grounds, but we consider instead the merits of the parties' respective arguments, as we may do in our review on appeal. See Lucas v. W. W. Grainger, Inc., 257 F.3d 1249, 1256 (11th Cir. 2001) (holding that a judgment can be affirmed on appeal "on any ground that finds support in the record," including alternate grounds for summary judgment (quoting Jaffke v. Dunham, 352 U.S. 280, 281, 77 S. Ct. 307, 308, 1 L. Ed. 2d 314 (1957)). In the sections that follow, we examine each of Thompkins's claims or related group of claims under the

15

Copyright Act, the Lanham Act, Florida contract law, and Florida tort law of fraud, respectively.[9]

## III.

## A.

Thompkins first asserts a claim of infringement under the Copyright Act, 17 U.S.C. § 501,[10] alleging that Lil' Joe has illegally exploited copyrights owned by Thompkins in dozens of songs that he authored and performed on recordings.[11]

---

[9] Thompkins's amended complaint includes nine enumerated counts. Among them are claims entitled "Injunction" and "Attorney's Fees, Costs & Punitive Damages." These are clearly remedies and costs to which Thompkins is only entitled if he prevails; they are not causes of action in and of themselves. See, e.g., Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097–98 (11th Cir. 2004) ("[I]f the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise." ). The seven remaining actionable counts are pled as: "Violation of Copyright Act," "Violation of Lanham Act," "Breach of Contract," "Unjust Enrichment," "Promissory Estoppel," "Rescission and Restitution," and "Fraud." Because the breach of contract, unjust enrichment, promissory estoppel and rescission claims all rely on Florida law generally pertinent to contracts, we treat those claims together.

[10] 17 U.S.C. § 501(a) provides, "Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 . . . is an infringer of the copyright[.]"

[11] The specific songs for which Thompkins claims copyright ownership are listed by name in the mandatory initial disclosures that he filed in support of his original complaint in the Northern District of Georgia, and to which his amended complaint refers. Oddly, the record contains no single piece of evidence compiling all the works in question and explicitly indicating which specific titles were covered by which contracts between Thompkins and Luke Records. This information is obviously relevant to determining the ultimate ownership of the copyrights in the various songs.

In our review of the piecemeal record, we are able to conclude that the songs listed on Thompkins's initial disclosures fall into four categories: (1) songs that were released on the first Poison Clan album, 2 Low Life Muthas; (2) songs that were released on the second Poison Clan album, Poisonous Mentality; (3) songs that were released on the third Poison Clan album, Rufftown Behavior; and (4) songs that were released on records by Luther Campbell as a performer, with Thompkins performing in a "sideman" capacity. All of the first three categories

16

Thompkins created and performed these compositions either for his Poison Clan records under the 1989 Agreement ("the Poison Clan Songs") or in collaboration with Luther Campbell for use on records Campbell released as a performer ("the Campbell Songs"). We examine separately the copyright claims on the Poison Clan Songs and the Campbell Songs.

1.

With regard to the Poison Clan Songs, Thompkins argues that any copyrights he transferred to Luke Records under the 1989 Agreement reverted to his ownership when Luke Records rejected the Poison Clan contracts as executory under the bankruptcy Joint Plan.[12] Thompkins further argues that, upon reversion

---

of songs are covered by the 1989 Agreement, as those songs appeared on albums produced under Thompkins's initial recording contract with Luke Records. The fourth category, discussed in greater detail at part III.A.2., infra, is covered by the Sideman Agreements; the record contains no evidence of any other contractual agreements governing the rights to the songs in this category.

[12] We pause for a moment here to make clear what "copyrights" are at issue with regard to the Poison Clan Songs. Lil' Joe contends that under the confirmed Joint Plan, it came to own copyrights in both the sound recordings and the musical compositions of the Poison Clan Songs. As to the former, there is no dispute that Luke Records received the copyrights to the sound recordings under the 1989 Agreement. Thus, to the extent that Lil' Joe acquired Luke Records' assets through the reorganization – which we discuss in the text following this note, infra – Lil' Joe would unquestionably have gained ownership of the sound recording copyrights in the Poison Clan Songs.

As to the latter, Lil' Joe's claim to ownership of the musical composition copyrights is based on Thompkins's assignment of all or part of those copyrights to Luke Records via two sets of documents: the 1992 Addendum to the 1989 Agreement, and/or a series of "songwriter agreements" executed during the term of the 1989 Agreement and purportedly transferring one hundred percent of Thompkins' composition copyrights in dozens of individual songs on the three Poison Clan albums. Thompkins disputes the validity of the 1992 Addendum and the songwriter agreements, arguing that Luke Records (and thus, Lil' Joe) never came to own any

17

of the copyrights, those assets ceased to constitute part of the bankruptcy estate

and thus were not transferred to Lil' Joe under the Joint Plan, notwithstanding the

language of the Plan and the various supporting documents and bankruptcy orders

suggesting that the copyrights were meant to be transferred. Accordingly,

---

part of the composition copyrights.

We need not consider the songwriter agreements, for the 1992 Addendum sufficiently establishes that Luke Records owned half of the musical composition copyrights in the Poison Clan Songs. The 1992 Addendum by its terms transferred fifty-percent ownership of the composition copyrights to Luke Records. To the extent that Lil' Joe acquired Luke Records' assets through the bankruptcy, Luke Records' half-ownership would have transferred to Lil' Joe. This is significant because, if Lil' Joe is now a co-owner of the composition copyrights (in addition to being full owner of the sound recording copyrights), Thompkins cannot maintain his suit for infringement. See Quintanilla v. Tex. Television Inc., 139 F.3d 494, 498 (5th Cir. 1998) ("A co-owner of a copyright cannot be liable to another co-owner for infringement of the copyright." (quoting Oddo v. Ries, 743 F.2d 630, 632–33 (9th Cir. 1984))); Zuill v. Shanahan, 80 F.3d 1366, 1369 (9th Cir. 1996) (same); cf. MCA Television Ltd. v. Pub. Interest Corp., 171 F.3d 1265, 1275 (11th Cir. 1999) (applying a similar principle that exclusive licensees of copyrights cannot be liable for infringement).

Thompkins attempts to disclaim the 1992 Addendum, alleging that it is invalid because it "was not executed by any representative of Luke [Records]" and for failure of consideration. As a matter of law, these arguments are insufficient to free Thompkins from his obligations under the contract. See Diaz v. Rood, 851 So. 2d 843, 846 (Fla. 2d Dist. Ct. App. 2003) ("It is clear that a promise, no matter how slight, can constitute sufficient consideration so long as a party agrees to do something that they are not bound to do." (internal quotations omitted)); Dodge of Winter Park, Inc. v. Morley, 756 So. 2d 1085, 1085–86 (Fla. 5th Dist. Ct. App. 2000) ("Generally, it is enough that the party against whom the contract is sought to be enforced signs it."); Skinner v. Haugseth, 426 So. 2d 1127, 1131 (Fla. 2d Dist. Ct. App. 1983) (same). Thompkins does not dispute the authenticity of his signature or claim that he expressly intended that the Addendum only be valid upon signatures of all parties. Furthermore, the Addendum itself recites Luke Records' consideration – its promises to compensate Thompkins for his assignment of fifty percent of the copyrights. Accordingly, we find that the 1992 Addendum is valid and binding on Thompkins, and Luke Records held half-ownership in the composition copyrights in the Poison Clan Songs. Thus, when we refer to "copyrights" in this subsection, we include both the sound recording and musical composition copyrights. Furthermore, because the 1992 Addendum modified the terms of the 1989 Agreement, for ease of reference we hereinafter include the former when we refer to the latter.

Thompkins argues, Lil' Joe infringed his copyrights when it exploited them after the plan confirmation. Lil' Joe disputes Thompkins's interpretation of the effect of the Joint Plan confirmation, arguing instead that Luke Records' ownership of the copyrights was unaffected by its rejection of any contracts. Thus, Lil' Joe contends, those copyrights were transferred to Lil' Joe among other Luke Records assets disposed of by the terms of the Joint Plan.

The terms of the 1989 Agreement clearly transferred ownership of the disputed copyrights to Luke Records in the course of its business relationship with Thompkins, well before the bankruptcy. The parties now dispute the effect on copyright ownership caused by Luke Records' rejection of the 1989 Agreement in the bankruptcy as an executory contract pursuant to 11 U.S.C. § 365.[13] Because

_____

[13] Under § 365(a), "the trustee, subject to the court's approval, may assume or reject any executory contract . . . of the debtor." This provision has spawned much litigation over the proper definition of an "executory contract," and courts have struggled to formulate a coherent approach to the issue. The parties in this case have likewise grappled with the definition of the contracts at issue between Thompkins and Luke Records. On appeal, the parties agree that the contracts were "executory" for the purposes of § 365 and that Luke Records rejected them. But this rare point of agreement between the parties is unique to the appeal in this case; in the district court, Thompkins maintained exactly the opposite position, asserting that the contracts were improperly treated as executory by the bankruptcy court.

Fortunately, we need not descend into the morass and attempt to define "executory" in this case. The parties do not contest that issue on appeal, and even if they were so inclined, we might otherwise be precluded from reconsidering the "executoriness" of the contracts. That issue was already decided by various bankruptcy court orders deeming the relevant contracts to be executory and confirming their rejection. In addition to the Confirmation Order generally deeming any unassumed contracts to be rejected, the order setting the bar date for rejection claims in the Luke Records bankruptcy specifically designated the "exclusive recording contracts" with Poison Clan as rejected executory contracts.

post-bankruptcy ownership of the copyrights determines Thompkins's ability to assert copyright claims on the Poison Clan Songs in this suit, we must decide whether Luke Records' rejection of the 1989 Agreement had any effect on Luke Records' – or, more precisely, its bankruptcy estate's – continued ownership of those copyrights in the bankruptcy.

We hold that the rejection of the 1989 Agreement did not cause ownership of the Poison Clan Song copyrights to revert to Thompkins; thus, the copyrights properly passed into Luke Records' bankruptcy estate and from there were legally assigned to Lil' Joe. In essence, Thompkins asks this court to deem an executory contract rejection under § 365 to be the functional equivalent of a rescission, rendering void the contract and requiring that the parties be put back in the

Although we do not find it necessary to reexamine whether the 1989 Agreement was properly treated as "executory," we note that the bankruptcy court's approval of the rejection of the 1989 Agreement would be consistent with the "functional approach" to "executoriness" that we have tacitly approved in our precedent. That is, "[e]ven though there may be material obligations outstanding on the part of only one of the parties to the contract, it may nevertheless be deemed executory . . . if its assumption[] [or] rejection would ultimately benefit the estate and its creditors." Sipes v. Gen. Dev. Corp. (In re Gen. Dev. Corp.), 177 B.R. 1000, 1012 (S.D. Fla. 1995) (quoting Order on Evidentiary Rehearing Pursuant to Remand at 11–16, Sipes v. Gen. Dev. Corp. (In re Gen. Dev. Corp.), No. 90-12231, (Bankr. S.D. Fla. Sept. 16, 1994) (emphasis omitted)), aff'd sub nom. Sipes v. Atl. Gulf Cmtys. Corp. (In re Gen. Dev. Corp.), 84 F.3d 1364, 1365, 1374 (11th Cir. 1996). The bankruptcy court presumably determined that rejection of the 1989 Agreement would benefit the Luke Records estate by maximizing the value of the copyrights. The enhanced value of the copyrights in turn increased the value of the estate and the amount available to be paid to all of Luke Records' creditors – including Thompkins, had he properly filed a claim in the bankruptcy.

positions they occupied before the contract was formed.[14]  This is not the purpose

of § 365, nor does Thompkins cite any authority to show otherwise.

In support of his argument, Thompkins relies on the proposition that a

debtor cannot accept only the benefits of an executory contract while eschewing

the burdens.  See, e.g., In re Beverage Canners Int'l Corp., 255 B.R. 89, 95 (Bankr.

S.D. Fla. 2000); 3 Collier on Bankruptcy § 365.03[1] (15th ed. rev. 2005).  He also

correctly observes that § 365 of the bankruptcy code ordinarily deems rejection of

an executory contract to be "a breach of such contract . . . immediately before the

date of the filing of the [bankruptcy] petition."  11 U.S.C. § 365(g); see also

Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert

Group, Inc.), 138 B.R. 687, 711 (Bankr. S.D.N.Y. 1992).  Thompkins apparently

concludes that because Luke Records' rejection of the 1989 Agreement constituted

a pre-petition breach of that contract, that event somehow reverses any transfer of

asset ownership previously carried out by the rejected contract.  In other words,

Luke Records' rejection of the "burdens" of the 1989 Agreement prevents Luke

Records from keeping the "benefits," which, in Thompkins's view, are the

copyrights Luke Records received.

---

[14] Thompkins also alleges a separate cause of action in his amended complaint for "Rescission and Restitution" under Florida law.  We address that claim in part III.C.2., infra.

21

It is true that a debtor must either assume an executory contract in its entirety or completely reject it, see Byrd v. Gardinier, Inc. (In re Gardinier, Inc.), 831 F.2d 974, 975 (11th Cir. 1987), but Thompkins misunderstands the implications of rejection under § 365. Thompkins's argument basically calls for an interpretation of rejection as an outright dissolution of the contract. But rejection "does not embody the contract-vaporizing properties so commonly ascribed to it. . . . Rejection merely frees the estate from the obligation to perform; it does not make the contract disappear." In re Drexel Burnham Lambert Group, Inc., 138 B.R. at 703. More specifically, "[r]ejection has absolutely no effect upon the contract's continued existence; the contract is not cancelled, repudiated, rescinded, or in any other fashion terminated." Id. at 703 (quotations omitted); see also Eastover Bank for Savings v. Sowashee Venture (In re Austin Dev. Co.), 19 F.3d 1077, 1082 (5th Cir. 1994) (holding that rejection under § 365(g) "does not mean that the executory contract . . . has been terminated, but only that a breach has been deemed to occur"); O'Neill v. Cont'l Airlines, Inc. (In re Cont'l Airlines), 981 F.2d 1450, 1459 (5th Cir. 1993) ("To assert that a contract effectively does not exist as of the date of rejection is inconsistent with deeming the same contract breached."); cf. Enter. Energy Corp. v. United States (In re Columbia Gas Sys., Inc.), 50 F.3d 233, 239 n.8 (3d Cir. 1995) ("Rejection, which

22

is appropriate when a contract is a liability to the bankrupt, is equivalent to a nonbankruptcy breach.").

The Drexel Burnham Lambert Group case, cited by Thompkins himself, presents a useful illustration of what a § 365 rejection does and does not affect. The corporate debtor, in an attempt to avoid its prospective obligations to compensate its former general counsel under the terms of an employment agreement, sought to reject the agreement as executory under § 365. In re Drexel Burnham Lambert Group, Inc., 138 B.R. at 694–95. Among the compensation provided for in the agreement were various monetary payments, plus three stock portfolios purchased by the former general counsel from the debtor upon execution of the agreement and held in escrow for future disbursement. Id. at 692. The debtor claimed that by rejecting the employment contract – the means by which the stock portfolios were purchased and escrowed by the general counsel – the debtor "pull[ed] the plug" on the general counsel's rights to the escrowed portfolios. Id. at 695.

The bankruptcy court granted the debtor's motion to reject the contract, resulting in a prepetition breach under the terms of § 365(g) and converting the monetary balance owed to the general counsel into "a general unsecured claim that can be paid in 'tiny Bankruptcy Dollars.'" Id. at 711 (citation omitted). As to the

23

stock portfolios, however, the court "repudiate[d] Debtor's contention that rejection vaporizes or otherwise avoids [the general counsel's] interest in the escrowed funds." Id. The terms of the agreement gave the general counsel "both legal title and the equitable interest" in the escrowed stock, and the only right the debtor company retained in the stock upon execution of the agreement was a contingent interest subject to a condition subsequent, which ultimately never materialized. Id. at 710. When the condition subsequent became moot, the general counsel "became entitled to immediate possession" of the stocks, and that possession was unaffected by the rejection of the contract. Id.

Like the debtor in Drexel Burnham Lambert Group, Thompkins argues that Luke Records "pulled the plug" on its own claim of ownership over the copyrights when it rejected the contract; thus, he contends, the copyrights could not have been assigned to Lil' Joe out of Luke Records' estate. But like the bankruptcy court in Drexel Burnham Lambert Group, other courts have observed that rejection differently affects the unperformed portions of an executory agreement and those provisions of the agreement that, by their nature, are fully executed. See Rudaw/Empirical Software Prods. Ltd. v. Elgar Elecs. Corp. (In re Rudaw/Empirical Software Prods. Ltd.), 83 B.R. 241, 246 (Bankr. S.D.N.Y. 1988); In re Executive Tech. Data Sys., 79 B.R. 276, 282 (Bankr. E.D. Mich.

24

1987) ("Section 365 addresses only future performance obligations of the parties. It does not have any impact upon the executed portions of a contract."); cf. Leasing Serv. Corp. v. First Tenn. Bank Nat'l Ass'n, 826 F.2d 434, 436–37 (6th Cir. 1987) (holding that a security interest, which was created by covenant in an executory agreement, was fully vested and thus non-executory, leaving it unaffected by the bankruptcy trustee's rejection of the executory agreement) (citing Jenson v. Cont'l Fin. Corp., 591 F.2d 477, 482 (8th Cir. 1979)). The rejection of a pre-petition executory contract pursuant to which the debtor acquired property does not obligate the debtor to return the property. In re Executive Tech. Data Sys., 79 B.R. at 282; see also In re Rudaw/Empirical Software Prods. Lit., 83 B.R. at 245–46 ("[T]he debtor cannot undo an executed sale of property where title has passed. Such property does not revert . . . as a result of the debtor's rejection of the executory contract."); In re DMR Fin. Servs., Inc., 274 B.R. 465, 472 (Bankr. E.D. Mich. 2002) (dictum); cf. Fain v. Irving Trust Co. (In re Waterson, Berlin & Snyder Co.), 48 F.2d 704, 710 (2d Cir. 1931) (holding that where copyright assignments from composers to debtor "were absolute," "title is in the bankrupt estate. . . . The composers cannot object if the trustee sells the copyrights").

There is no debate that Thompkins's transfer of his copyrights to Luke

25

Records under the 1989 Agreement was an executed sale of property. The terms of the Agreement leave Thompkins not even so much as a contingent interest in the copyrights. Nor did Thompkins negotiate any specific requirements for the sale or promotion of his records; Luke Records needed only to "commercially release" each record, which it undisputedly did, and all matters of business judgment in such efforts were reserved to Luke Records and binding on Thompkins. To the extent the 1989 Agreement was "executory," in the sense of not being fully executed, it was only insofar as Luke Records was required to pay Thompkins royalties based on any future sales of his records. The transfer of the copyrights was fully executed, however, and Luke Records held full legal and equitable title under the terms of the Agreement.

Thus, when the bankruptcy court approved the rejection of the Agreement, it freed Luke Records from the obligation, or "burden," to pay royalties under the contractual terms and gave Thompkins a pre-petition claim for damages resulting from the breach. See In re Gardinier, Inc., 831 F.2d at 976 n.2; In re Austin Dev. Co., 19 F.3d at 1082; In re Drexel Burnham Lambert Group, Inc., 138 B.R. at 711. It also would have released Thompkins from any outstanding obligation to perform under the Agreement – i.e., to convey any as-yet unrealized "benefit" to Luke Records. But the bankruptcy court's Confirmation Order did not effectively

26

rescind the 1989 Agreement and reverse the executed transfer of the Poison Clan

Song copyrights to Luke Records. The rejection had no effect on Luke Records'

ownership of the copyrights, and they passed from the estate to Lil' Joe under the

terms of the Joint Plan and Confirmation Order (and the later documents executing

the agreed upon and confirmed terms of the reorganization). Accordingly,

Thompkins cannot support a claim of copyright infringement against Lil' Joe as to

the Poison Clan Songs, and we affirm the grant of summary judgment on that

claim in favor of Lil' Joe.

2.

Thompkins's complaint also alleges copyright infringement as to songs that

he created and performed in collaboration with Luther Campbell for use on

Campbell's records. In his amended complaint, Thompkins alleges that he granted

Luke Records only "a non-exclusive license to exploit his performances" on these

Campbell Songs in exchange for royalties, and that the four Sideman Agreements

he signed regarding these songs did not "transfer any of Plaintiff's ownerships

[sic] interests in the copyright in either the sound recordings or the compositions."

There is scant evidence in the record pertaining to the Campbell Songs, and none

of it appears to address ownership of copyrights, whether in the sound recordings

or musical compositions. Presumably, under 17 U.S.C. § 201(a), Thompkins was

at least a co-owner of the copyrights in joint works to which he contributed.

But whether or not Thompkins might have been able to make out a claim of infringement on the Campbell Songs, he does not specifically address that claim in his arguments on appeal. Accordingly, we determine that the claim is waived, and we do not consider it here. See Allstate Ins. Co. v. Swann, 27 F.3d 1539, 1542 (11th Cir. 1994) ("Issues that clearly are not designated in the initial brief ordinarily are considered abandoned."). Although Thompkins filed a general notice of appeal from the entry of final judgment on all his claims, and "[a]lthough we have a practice of reading briefs liberally to ascertain the issues raised on appeal," U.S. v. Milam, 855 F.2d 739, 743 (11th Cir. 1988), under no fair reading of Thompkins's briefs could we conclude that he asserted on appeal an argument pertaining to his claim of infringement of the Campbell Songs. See id.

Thompkins has failed to mention these songs at all on appeal, and his initial brief's statement of the issues relevant to the copyright claims focus entirely on the effect of rejection under § 365. Based on the scant record regarding Thompkins's claim of infringement on the Campbell Songs, it appears his theory is that Luke Records never obtained any ownership interest in the Campbell Song copyrights in the first instance. If that were true (and we express no opinion either way on the issue), the Luke Records bankruptcy proceedings would be irrelevant

28

to that claim. Thompkins would ostensibly have retained whatever ownership interest he originally had in the Campbell Song copyrights, and his infringement claim against Lil' Joe would be uncomplicated by the intervening transfer of assets through the bankruptcy and its attendant affects on the parties' rights to the assets. Because Thompkins chose to argue on appeal only his interpretation of the effects of rejection under § 365 – relevant only to those assets that might have transferred through the bankruptcy, i.e., the copyrights in the Poison Clan Songs – and because he nowhere mentions his claim regarding the Campbell Songs, we must deem that claim to be waived. See id. (deeming an untimely-raised alternate argument to be waived on appeal where, "[i]ntentionally or not, the appellants . . . took an 'all or nothing' approach" by not appealing the district court's decision on the alternate ground).

B.

In addition to his copyright claims, Thompkins alleges that Lil' Joe has violated provisions of the Lanham Trademark Act of 1946, ch. 540, 60 Stat. 427 (codified as amended in scattered sections of 15 U.S.C.). On appeal, Thompkins argues that Lil' Joe runs afoul of two separate provisions of the Act: 15 U.S.C. §

1114,[15] dealing with trademark infringement, and 15 U.S.C. § 1125,[16] dealing with false designation of origin. First, Thompkins's § 1114 claim was not properly raised in the district court, and thus we do not consider it here. Even a generous reading of Thompkins's amended complaint in light of liberal pleading rules reveals that the complaint nowhere states a claim under § 1114. The complaint never so much as mentions the word "trademark," let alone alleges that

[15] 15 U.S.C. § 1114(1) provides in relevant part:
> Any person who shall, without the consent of the registrant –
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
> (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

[16] 15 U.S.C. § 1125(a)(1) provides in relevant part:
> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
> shall be liable in a civil action by any person who believe that he or she is or is likely to be damaged by such act.

Thompkins owns one and that Lil' Joe used it in an infringing manner.

Thompkins apparently first attempted to assert his would-be § 1114 claim in his response to Lil' Joe's motion for summary judgment. This is procedurally improper; at the summary judgment stage, Thompkins should have sought to amend his complaint in accordance with Federal Rule of Civil Procedure 15(a) if he wished to add a claim. See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004).[17]

We dispose just as easily of Thompkins's § 1125 claim for false designation of origin. Thompkins essentially claims that by selling copies of records that he wrote and performed, Lil' Joe is falsely designating itself the "origin" of those "goods," in contravention of the statute. Thompkins does not allege that Lil' Joe is selling his records under someone else's name – i.e., passing off his works as

---

[17] Thompkins argues that his § 1114 claim was preserved through the Joint Pretrial Stipulation filed by the parties in the district court. He cites this court's decision in G.I.C. Corp. v. United States, 121 F.3d 1447, 1450 (11th Cir. 1997), for the proposition that parties are bound by their assertions in pretrial stipulations under Fed. R. Civ. P. 16. He argues that, because Lil' Joe listed "the scope of the 'J.T. Money' trademark" on the Stipulation as among the remaining issues of fact to be decided by the district court, it cannot contest the pleading of his § 1114 claim. Essentially, Thompkins argues that a defendant can stipulate away in pretrial proceedings its objection to a claim that was never pled in any form in the complaint. Even if that were true – G.I.C. Corp. does not stand for that proposition, and we do not decide it here – we find that Thompkins overstates the contents of the pretrial stipulation. Lil' Joe does not stipulate to the existence of a § 1114 claim; in fact, neither party lists § 1114 or "trademark infringement" or any like phrasing as among the legal issues it considers still in dispute. Under these circumstances, we can hardly find that the pretrial stipulation indicated Lil' Joe's accession to the existence of a § 1114 claim that was never pled in the complaint.

31

those of another artist – but simply that Lil' Joe is selling copies of Thompkins's works with Lil' Joe indicated as the creator of the actual physical records. The Supreme Court has explicitly held that such conduct does not give rise to a claim under § 1125. Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 37–38, 123 S. Ct. 2041, 2050, 156 L. Ed. 2d 18 (2003) (interpreting "origin of goods" under the statute to refer to "the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods"). Thompkins concedes on appeal that this is so; accordingly, his § 1125 claim fails.

## C.

As an alternative to his claim of copyright ownership, Thompkins alleges four claims based on contract theories under Florida common law. We first address Thompkins's breach of contract claim, and then we address his remaining contract claims together.

## 1.

Thompkins bases his breach of contract claim on the theory that Lil' Joe became liable for Luke Records' obligations when it purchased Luke Records' assets in the bankruptcy. Although Thompkins's entitlement to royalties arose entirely from his contracts with Luke Records, Thompkins alleges that Luke

32

Records is the "predecessor in interest" to Lil' Joe, and that Lil' Joe has reproduced and used Thompkins's sound recordings and musical compositions "under the contractual agreements between Plaintiff and Luke [Records] assumed by [Lil' Joe]." By failing to pay him royalties in accordance with his agreements with Luke Records, Thompkins argues, Lil' Joe has breached those contracts.

Notably, Thompkins does not allege that Lil' Joe breached any contract to which it was itself an original party, nor does he claim that Lil' Joe came to be liable for Luke Records' contractual obligations by execution of a novation or any other sort of contractual device. Instead, he claims that the bankruptcy proceedings, by operation of law, resulted in Lil' Joe being subject to a duty to pay royalties.[18] Thompkins argues that this result is necessary to protect the authorial

---

[18] In addition to the reorganization provisions summarized in part I.B., supra, the Confirmation Order also specified certain binding modifications to the terms of the Joint Plan and Letter of Intent. Among these modifications, the Order states that, "[i]n addition to the other assets to be transferred to [Lil' Joe] under the terms of the Plan and the Letter of Intent, Luke Records is hereby directed to transfer and assign to [Lil' Joe] . . . all of its right, title and interest in and to each contract rejected pursuant to Section 365 of the Bankruptcy Code, subject to the Liquidating Trustees' right to assert defenses, recoupment or setoff." This language also appears in the Bill of Sale from Luke Records to Lil' Joe for the master recordings themselves, which were purportedly transferred "[t]ogether with . . . all right, title and interest in and to each contract rejected pursuant to section 365 . . . free and clear of any and all liens, claims, encumbrances, charges, setoffs, or any recoupments of any kind, and shall be transferred free and clear of any interest in such property of an entity other than [Luke Records]."

In our review of the record, this language alone among all the bankruptcy court filings suggests any possible intent by the bankruptcy court to transfer any rights or obligations under the various Thompkins-Luke Records contracts to Lil' Joe (as opposed to ownership of the master recording and copyright assets themselves). Thompkins, however, does not invoke this language in support of his contract claims against Lil' Joe – in fact, neither party addresses it at

33

interest recognized by copyright law. According to his essentially equitable theory, it is unfair for his royalty rights to be severed from the copyrights through the bankruptcy.

We are not persuaded. In support of his argument, Thompkins relies primarily on a decision of the Ninth Circuit Court of Appeals in Yount v. Acuff Rose-Opryland, 103 F.3d 830 (9th Cir. 1996), which in turn cites Fain v. Irving Trust Co. (In re Waterson, Berlin & Snyder Co.), 48 F.2d 704 (2d Cir. 1931). The Yount case lends Thompkins's argument no support, as the purchaser of the copyrights out of bankruptcy in that case apparently did not contest that it had assumed the royalty obligation created by the original copyright assignment/royalty agreement entered into by the debtor. 103 F.3d at 832–33. Yount concerned only a dispute over which of two parties was the proper recipient of the royalties. Id. The In re Waterson, Berlin & Snyder Co. decision, on its face, appears more pertinent. In that case, the Second Circuit held that, although a trustee may sell copyrights out of a bankruptcy estate, "they should be sold subject

---

all. This is just as well, for we find the language to be inconclusive. If, as is clearly the case, the bankruptcy court deemed the Thompkins-Luke Records contracts to be executory and ordered their rejection, then, as a result of that unappealed order, Luke Records was freed of its obligation to perform. Thus, Luke Records no longer owed any contractual duty that could be transferred to Lil' Joe as a "right, title [or] interest" in the contracts; all that remained was a rejection damages claim that Thompkins could have asserted via a proof of claim in the bankruptcy against Luke Records. At most, then, the above-quoted modification language would seem to have created a null set. Accordingly, we find it does not affect this appeal.

34

to the right of the composers to have them worked in their behalf and to be paid royalties according to the terms of the contracts." In re Waterson, Berlin & Snyder Co., 48 F.2d at 710. In deciding to impose an equitable servitude on the copyrights, the court was choosing between what it saw as two possible outcomes. Id. As the court framed the problem, either the copyright transfer might be rescinded and the copyrights reconveyed to the authors, or the copyrights could be sold subject to the royalty obligations entered into by the debtor. Id.

Neither of the options considered by the court in In re Waterson, Berlin & Snyder Co. is possible within the mechanism provided by § 365 under the current incarnation of the bankruptcy code,[19] and the parties do not dispute that it is the operation of § 365 that determines their respective rights. As we have discussed, supra, rescission is not a possible function of § 365.[20] Nor does the equitable imposition of a royalty obligation on the post-bankruptcy purchaser of copyright

---

[19] Of course, § 365 did not exist in its current form until 1978, decades after the Second Circuit decided In re Waterson, Berlin & Snyder Co. See 11 U.S.C. § 365 (originally enacted as Bankruptcy Act of 1978, ch. 3, § 365, 92 Stat. 2549). That court, however, did not refer to any then-existing principles of bankruptcy law governing rejection of contracts, either, nor does the opinion suggest that the trustee in that case attempted to reject the copyright transfer agreement. For these reasons, we find the decision not to be persuasive in our consideration of the instant case.

[20] To the extent that rescission of a copyright transfer agreement is possible at all, it would be under state law, not § 365. See Yount, 103 F.3d at 834 ("[R]ecission itself is a creature of state law. Nothing in [In re Waterson, Berlin & Snyder Co.] suggests the contrary." (citation omitted)). See discussion at part III.C.2., infra.

35

assets serve the purposes of the bankruptcy code. The court in <u>In re Waterson, Berlin & Snyder Co.</u> was concerned that, unless the author's royalty rights followed the copyrights through the bankruptcy to the purchaser of the assets, the author may be "deprive[d] . . . of the only means of fixing the royalties which [he has] been promised." 48 F.2d at 710. But the bankruptcy code specifically addresses that problem by providing that rejection of an executory contract under § 365(g) constitutes a pre-petition breach, and the non-debtor party to the rejected contract becomes a general unsecured creditor who may seek contract damages against the debtor as a pre-petition claim in the bankruptcy. <u>See</u> 11 U.S.C. § 502(g); <u>Byrd v. Gardinier, Inc. (In re Gardinier, Inc.)</u>, 831 F.2d 974, 976 n.2 (11th Cir. 1987); <u>Eastover Bank for Savings v. Sowashee Venture (In re Austin Dev. Co.)</u>, 19 F.3d 1077, 1082 (5th Cir. 1994); 3 <u>Collier on Bankruptcy</u> § 365.09 (15th ed. rev. 2005).

Thus, the author-assignor is not left completely without recourse in the event that his original copyrights, transferred in consideration of future royalties, are later sold to a third party out of the debtor-assignee's estate, free and clear of royalty obligations due to the rejection of the original copyright transfer/royalty agreement. In that event, the bankruptcy code explicitly provides a means by which the author can file a damages claim against the debtor for what is deemed a

pre-petition breach of contract.

This was precisely the course available to Thompkins, and of which he undisputedly did not avail himself. Luke Records' obligation to pay royalties – wholly a creature of its contracts with Thompkins – was rejected in accordance with § 365 along with all Luke Records' other contractual obligations to Thompkins. The bankruptcy court confirmed that rejection and ordered the non-debtor parties to rejected contracts to file proofs of claim for rejection damages within thirty days of the date of the Confirmation Order "or forever be barred from asserting such claims." Thompkins had notice of these developments, but did not file a claim for damages.[21] The bankruptcy court's disposition of the

---

[21] Thompkins did file a proof of claim earlier in the Luke Records bankruptcy, prior to the proposal of the Joint Plan. That proof of claim, however, only sought pre-petition royalties on records already sold, not damages for the breach of Luke Records' prospective obligation to pay Thompkins royalties on future sales of his works. The proof of claim was how Thompkins became known to the bankruptcy court as a creditor, and it resulted in his being on notice of all the later proceedings involving the Joint Plan and its confirmation. Thompkins did not recover anything on that proof of claim for past royalties; the creditors' committee objected to it, and he never did anything else to protect his rights.

Although it is not directly pertinent to this appeal, we also note that while any damages claim Thompkins might have made for future royalties would necessarily have been somewhat speculative, the bankruptcy code anticipates this issue and explicitly allows for the estimation of "any contingent or unliquidated claim, the fixing or liquidation of which . . . would unduly delay the administration of the case." See 11 U.S.C. § 502(c)(1); Certified Class v. Charter Co. (In re Charter Co.), 876 F.2d 866, 872–73 (11th Cir. 1989) (noting that estimation of contingent and unliquidated claims is "mandatory" under the code, and that bankruptcy courts are thus "well used to the estimation procedures . . . even in complex cases"). The estimation provision thus makes it possible for a creditor in Thompkins's position to recover some damages through the bankruptcy where otherwise he might have little or none. In a standard contract suit for future royalties, such as his claim here, Thompkins's damages would be speculative and would likely result in only nominal damages.

Joint Plan and the estate's assets was consistent with the code's scheme for rejection damages. Thompkins simply slept on his rights, and any damages to which he might have been entitled were waived accordingly.

Of course, while it is useful to note what Thompkins should have done to protect his rights as against Luke Records in the bankruptcy, his potential recovery there is not the issue that controls Thompkins's contract claims against Lil' Joe here. Instead, we need only observe that, upon its rejection of the contract, Luke Records was no longer obliged to pay royalties. In the place of royalties, Thompkins was entitled to rejection damages from Luke Records' estate in the bankruptcy – none of which has anything to do with Lil' Joe. Furthermore, the bankruptcy court ordered that Lil' Joe was a good faith, arms'-length, third party purchaser, and that the assets it was purchasing were to be transferred "free and clear of any interest in such property of an entity other than the Debtors." Thus, Thompkins cannot show that any of Luke Records' obligations under its contracts with Thompkins passed through the bankruptcy to bind Lil' Joe. Without being able to prove the existence of a valid contract with Lil' Joe, he cannot maintain a

---

Nor does the prospective nature of the rejection damages somehow remove them from the category of pre-petition claims to be disposed of in bankruptcy; although the damages are valued on an estimation of future royalties, the breach for which the damages are awarded is deemed to be pre-petition by operation of § 365(g).

claim for breach of contract under Florida law.  See Rollins, Inc. v. Butland, ___ So. 2d ___, No. 2D05-368, 2006 WL 3686484, at *12 (Fla. 2d Dist. Ct. App. Dec. 15, 2006) (reciting the elements of a breach of contract claim).

2.

Thompkins's remaining claims based on contract theories are more easily resolved.  In light of our above holdings, they are without merit.  First, Thompkins alleges a quasi-contractual theory of unjust enrichment, claiming that Lil' Joe has unjustly profited from its "misappropriation" of his works and its "receipt of profits and monies owed and due Plaintiff from such works."  Among other elements of an unjust enrichment claim under Florida law, a plaintiff must show circumstances such that it would be inequitable for the defendant to retain the benefit conferred by the plaintiff without paying for it.  Nova Info. Sys., Inc. v. Greenwich Ins. Co., 365 F.3d 996, 1006–07 (11th Cir. 2004).  As we have held, supra, however, Lil' Joe became lawful owner of the copyrights through the bankruptcy, and it has no royalties obligations to Thompkins.  Thus, any profits Lil' Joe realizes from its exploitation of the copyrights that it lawfully purchased through the bankruptcy cannot be characterized as unjust, and Thompkins cannot maintain this claim.

Next, Thompkins makes a claim of promissory estoppel, the first element of

39

which is a representation by the defendant as to a material fact that is contrary to a later-asserted position. <u>Romo v. Amedex Ins. Co.</u>, 930 So. 2d 643, 650 (Fla. 3d Dist. Ct. App. 2006). Thompkins alleges that "Defendants have made promises to honor and pay for their exploitation of Plaintiff's sound recordings and copyrighted works." We find no evidence in the record of any such representations by Lil' Joe to support this assertion. It is unclear what Thompkins even intended by this claim, because the complaint contains no allegation identifying exactly what constituted the purported promise by Lil' Joe – or, for that matter, the later-asserted position contrary to that promise. Nor does our review of the record shed any significant light on what the allegedly actionable promise might be, given that all of Thompkins's business dealings relevant to this case were with Luke Records, not Lil' Joe.[22]

The only glimmer of a possible theory behind Thompkins's promissory

---

[22] We acknowledge that defendant Weinberger, prior to starting his own recording business as Lil' Joe Records, served as in-house counsel to Luke Records, and that Weinberger was ostensibly involved in at least some of Luke Records' dealings with Thompkins. But even if Thompkins meant to allege that Weinberger individually made the promise that is the subject of his estoppel claim, this argument is nonsensical. We fail to see how any representations Weinberger may have made in the course of those dealings could constitute a promise to "honor and pay for" exploitation of Thompkins's works by Lil' Joe – Lil' Joe Records did not even exist until after Weinberger left Luke Records. Moreover, Luke Records was still solvent throughout Weinberger's employment. Weinberger could not have known that a company he had not yet founded would ultimately purchase and exploit some of Thompkins's works as a result of a Luke Records bankruptcy that had yet to happen.

40

estoppel claim comes from his reply to Lil' Joe's summary judgment motion in the district court. There, in support of the claim, Thompkins asserted that "Weinberger promised and agreed in writing to the bankruptcy court that he would pay the artists, and then takes a contrary position." Here again, Thompkins's theory is based on his misunderstanding of the bankruptcy proceedings. Lil' Joe made no such promise in the bankruptcy; on the contrary, Lil' Joe has consistently asserted that it purchased the copyrights free and clear of any obligation to pay royalties. Accordingly, Thompkins's promissory estoppel claim also fails.

Finally, Thompkins makes a claim for rescission and restitution. While a party to recording contracts can properly seek rescission of those agreements under state law, see Yount, 103 F.3d at 834, Thompkins's theory in support of his claim is flawed. He alleges that "Plaintiff and Defendants entered into various agreements regarding the exploitation of Plaintiff's Works," and prays that "each and every contract or license or agreement of any kind between Plaintiff and Defendant be deemed rescinded." Yet, as we have noted, supra, none of the Luke Records agreements bind Lil' Joe, and Thompkins points to nothing in the record indicating that Lil' Joe ever entered into any other contract that would be

41

pertinent.[23]  Thus, Thompkins's claim fails the first requirement of a suit for rescission under Florida law – that the parties to the lawsuit lie in contractual privity.  See Bland v. Freightliner LLC, 206 F. Supp. 2d 1202, 1206–07 (M.D. Fla. 2002).  If Thompkins wished to seek rescission of his recording agreements, he should have done so in a claim against Luke Records, either before or as part of the bankruptcy proceedings.  That ship has long since sailed, so Thompkins's claim of rescission here against Lil' Joe must fail as a matter of law.

## D.

Finally, we consider Thompkins's claim of fraud under Florida law.  The requirements for a claim of fraud or fraudulent inducement are: (1) a false statement regarding a material fact; (2) the statement maker's knowledge that the representation is false; (3) intent that the representation induces another's reliance; and (4) consequent injury to the party acting in reliance.  See Wadlington v. Cont'l Med. Servs., Inc., 907 So. 2d 631, 632 (Fla. 4th Dist. Ct. App. 2005); Biscayne Inv. Group, Ltd. v. Guarantee Mgmt. Servs., Inc., 903 So.2d 251, 255 (Fla. 3d Dist. Ct. App. 2005).

---

[23] In our review of the record, we find evidence of only one contract to which both Thompkins and Lil' Joe were parties – a "sideman" agreement for Thompkins's contributions to songs by an artist named Mark Ross.  Ross was also a party to the agreement, which is dated September 13, 1995.  The agreement is irrelevant to this case.  Thompkins does not address it in any of his arguments, which makes sense given that the gravamen of his claims relates entirely to the Luke Records agreements.

We have trouble understanding the purported basis for this claim, as it appears Thompkins is himself unsure of the theory behind it. In his response to Lil' Joe's summary judgment motion in the district court, Thompkins lumped his fraud claim together with his claim for promissory estoppel. There, he made a conclusory argument that Lil' Joe misrepresented in the bankruptcy court that it would continue to pay the non-debtor parties to rejected contracts in accordance with Luke Records' royalty obligations. As we observed in our discussion of the promissory estoppel claim in part III.C.2., supra, this assertion is baseless.

Moreover, this later theory conflicts with the original theory of fraud that Thompkins alleged in the amended complaint. In pleading his fraud count in the complaint, Thompkins alleges four misrepresentations by Lil' Joe. Only one of these four alleged statements presents even a plausible basis for supporting the claim:[24] Thompkins alleges that, "[i]n order to induce Plaintiff to enter into the Luke Agreements, Luke [Records] and Weinberger represented to Plaintiff that

---

[24] The remaining three alleged representations are that "Defendants own 100% of the copyrights in Plaintiff's Works," that "Defendant's [sic] have no duty or obligation to account or pay royalties to Plaintiff," and that "the Songwriter Agreements are genuine and authentic documents." To the extent that Lil' Joe made these representations to Thompkins, it is impossible for Thompkins to prove that he relied on them to his detriment. Indeed, the very existence of Thompkins's lawsuit here belies any allegation of reliance on these representations– not only did he not believe these statements to be true, but he filed this suit to challenge them. Nor does Thompkins otherwise substantiate his alleged reliance. Thompkins seems to misunderstand the nature of fraud; simply believing a statement to be false does not make it fraudulent.

43

Plaintiff would receive royalties and accountings from Luke [Records]."

This theory fails all the same, however. Thompkins accuses both Luke Records and Weinberger individually. If Luke Records – which is not a defendant here – made misrepresentations to induce Thompkins to enter into contracts, Thompkins perhaps could have sued Luke Records, but he cannot recover from Lil' Joe for Luke Records' alleged torts. To the extent Thompkins alleges that defendant Weinberger individually misrepresented material facts (ostensibly during Weinberger's employment at Luke Records), the record simply contains no evidence to support it. While all of the contracts between Thompkins and Luke Records are premised on royalty payments, Thompkins points to no particular instances in which Weinberger individually represented to him that he would receive royalties and accountings.

Even if Thompkins had submitted such evidence, we doubt his claim has any merit. Under Florida law, a fraud claim cannot be premised on a promise to do something in the future except where the promise "is made without any intention of performing or made with the positive intention not to perform." Wadlington, 907 So. 2d at 632. Again, nothing in the record indicates that Weinberger or Luke Records intended at the time the contracts were made not to pay the royalties agreed upon. Additionally, we suspect this fraud claim is of the

44

type barred by the economic loss rule in Florida, under which "[m]isrepresentations relating to the breaching party's performance of a contract do not give rise to any independent cause of action in tort, [where] such misrepresentations are interwoven and indistinct from the heart of the contractual agreement." Hotels of Key Largo, Inc. v. RHI Hotels, Inc., 694 So. 2d 74, 78 (Fla. 3d Dist. Ct. App. 1997). Here, Thompkins complains about nothing more than that Luke Records and Weinberger did not fulfill their promises under the contract – exactly the basis for a breach of contract claim. In any event, Thompkins's fraud claims are insufficient, and so they must fail.

## IV.

Ultimately, this case boils down to a simple problem – Thompkins missed his chance through the bankruptcy to recover some of the royalty money he would have been owed by Luke Records. Having belatedly realized his error, he now asks this court to play the role of deus ex machina, swooping in to rescue his claims with interpretations of the bankruptcy code that ignore its premium on finality. This we cannot do. Thompkins may think unfair the procedure that Congress devised, but his legal arguments to overcome it are unavailing. We AFFIRM the district court's grant of summary judgment on all claims.

SO ORDERED.

45