[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-15353
Non-Argument Calendar

_____

D.C. Docket No. 8:17-cv-00328-CEH,
Bkcy No. 8:12-bkc-15725-KRM

In Re:

BAMBI ALICIA HERRERA-EDWARDS,

Debtor.

_____

BAMBI ALICIA HERRERA-EDWARDS
670 76th Avenue
St. Pete Beach, FL 33706-1808,

Plaintiff,

DARRYL E. ROUSON,
AS CURATOR OF THE ESTATE OF BAMBI ALICIA
HERRERA-EDWARDS,

Interested Party-Appellant,

versus

BERNARD EDWARDS COMPANY, LLC,
5750 Wilshire Blvd., Suite 590
Los Angeles, CA 90036-3697,
JESS S. MORGAN & CO., INC.,

5900 Wilshire Blvd., Suite 2300
Los Angeles, CA 90036 323-634-2400,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(August 7, 2018)

Before MARCUS, ROSENBAUM and HULL, Circuit Judges.

PER CURIAM:

This bankruptcy case involves Bambi Alicia Herrera-Edwards

("Herrera-Edwards"), who filed voluntary bankruptcy proceedings in 2012.

Herrera-Edwards was married to Bernard Edwards, a well-known singer,

songwriter, and producer who died in 1996.  After Mr. Edwards's death, litigation

over his estate ensued between (1) his widow, Herrera-Edwards, (2) his former

wife, Alexis Edwards, and (3) his six children.

Ultimately, the parties entered into a Settlement Agreement, and a

corresponding Co-Publishing Agreement, that divided royalties and compensation

from Mr. Edwards's copyrights and other assets.  For years, Herrera-Edwards

received a stream of income as a result of these agreements.

But in 2012, Herrera-Edwards filed for bankruptcy.  In her bankruptcy

petition, Herrera-Edwards asked the bankruptcy court to reject portions of the

2

Co-Publishing Agreement regarding the administration rights to Mr. Edwards's composition copyrights. Also in the bankruptcy court, Herrera-Edwards filed an adversary proceeding against two defendants: (1) a company owned by Mr. Edwards's children that managed their inherited interests—defendant-appellee Bernard Edwards Company, LLC (the "Edwards Company")—and (2) Mr. Edwards's business manager—defendant-appellee Jess S. Morgan & Co., Inc. (the "Morgan Company"). In that separate adversary proceeding, Herrera-Edwards sought artist and producer royalties from Mr. Edwards's copyrights and challenged a perpetual fee paid to the Morgan Company.

After a bench trial, the bankruptcy court issued its findings of fact and conclusions of law, which granted the defendants' motion for judgment on partial findings and denied Herrera-Edwards's motion to reject portions of the Co-Publishing Agreement. Herrera-Edwards then moved the bankruptcy court to amend its findings of fact or, alternatively, to grant a new trial, but the bankruptcy court denied her motion.

Herrera-Edwards appealed the bankruptcy court's rulings. Between oral argument in the district court and the entry of the district court's order (now on appeal), Herrera-Edwards died, and Darryl E. Rouson was appointed as curator of her estate. For the sake of simplicity, however, we address the appellant as Herrera-Edwards throughout this opinion.

3

On appeal, the district court affirmed the bankruptcy court's rulings. After careful review, we affirm the district court's rulings.

## I.    BACKGROUND

These disputes center on what interests Herrera-Edwards, and now her estate, obtained from the probate of her late husband Bernard Edwards's estate. Herrera-Edwards was represented by counsel at all times relevant to this action.

### A.    Bernard Edwards and his Music Career

Bernard Edwards co-founded the disco and funk band Chic. Mr. Edwards coauthored, performed, and produced many popular songs, including "Dance, Dance, Dance," "Everybody Dance," "Le Freak," and "We Are Family." Mr. Edwards had an ownership interest in the copyrights for the compositions he coauthored and received songwriter royalties for their use ("composition copyrights"). Mr. Edwards also received artist and producer royalties for performing and producing copyrighted sound recordings of these compositions ("recording copyrights"). Although Mr. Edwards received royalties for his role in making these sound recordings, he did not own their recording copyrights. Rather, a recording company—in this case, Atlantic Records—owned the recording copyrights related to Mr. Edwards's compositions.

Based on trial testimony in the bankruptcy court, songwriter royalties are paid whenever the words of a song are used, whether by performance or some

4

other medium.  Separately, artist and producer royalties are paid largely based on the number of record sales for a particular recording. Consequently, when a publishing company wants to use a recorded song, it has to buy two licenses—one for the composition itself and one for the audio recording.  The respective parties are paid accordingly.

At some point during his career, Mr. Edwards hired Wallace Franson and Franson's firm, the Morgan Company, to manage his business affairs. Mr. Edwards and Franson orally agreed that, while Mr. Edwards was a client, the Morgan Company would be compensated at 5% of Edwards's gross income.

## B.    Bernard Edwards's Death and Probate

On April 18, 1996, Mr. Edwards died.  Mr. Edwards was survived by his six children from a former marriage, his ex-wife Alexis Edwards, and his then-wife, appellant Herrera-Edwards.  Mr. Edwards's last will and testament named his six children as beneficiaries, established trusts in their names, appointed Franson as executor and trustee, and authorized Franson to substitute the Morgan Company as executor or trustee at his discretion.

Mr. Edwards's last will also disinherited appellant Herrera-Edwards, stating: "I [Bernard Edwards] have intentionally and with full knowledge omitted to provide herein for my wife [Herrera-Edwards]."  But, under Connecticut law, a surviving spouse, like Herrera-Edwards, has a statutory right to "a life estate of

5

one-third in value of all the property passing under the will, . . . after the payment of all debts and charges against the estate."  Conn. Gen. Stat. § 45a-436(a); see Dinan v. Patten, 116 A.3d 275, 288–96 (Conn. 2015) (explaining that the value of the statutory share should be calculated based on the value of the estate as of the date of distribution).  This right cannot be defeated by "any disposition of the property by will to other parties."  Conn. Gen. Stat. § 45a-436(a).

Mr. Edwards's estate was probated in Westport, Connecticut.  During that proceeding, appellant Herrera-Edwards filed a notice of election to take a statutory spousal share and asserted complete ownership of the Edwards home in Westport, Connecticut.  She also filed a $10 million tort claim against Mr. Edwards's estate in federal court.

The probate court rejected Herrera-Edwards's claim to the home, but granted her election for a statutory spousal share.  Both Herrera-Edwards and Mr. Edwards's estate appealed the probate court's decision.

## C.    Mediation

While the probate court's decision was on appeal, and the separate federal tort action was still pending, the parties attended mediation on July 9, 1997. Present at the mediation were Franson, Herrera-Edwards and her attorney, two of Mr. Edwards's adult children, a representative for one of Mr. Edwards's minor children, the attorney for Alexis Edwards (the ex-wife), and the attorney for Mr.

6

Edwards's estate. Ultimately, the parties signed and dated a handwritten stipulation outlining the terms of a proposed settlement ("July 9th Stipulation").

**D.    July 9th Stipulation and Applications for Settlement Approval**

The July 9th Stipulation stated that Herrera-Edwards: (1) would release "any claims" she had against Mr. Edwards's estate up to the date of the stipulation; and (2) would withdraw her federal tort action against Mr. Edwards's estate. In exchange, Herrera-Edwards would be assigned "full and complete ownership and interest in 37½% of all <u>royalties and other payments received from the copyrights and other such interests owned by Bernard Edwards at the time of his death</u>." (emphasis added). For a similar release of claims, Alexis Edwards also would receive "a percentage of the royalties to be agreed upon" by Franson at a later date. Those in attendance at the mediation agreed to subsequently "execute such documents, contracts and agreements as are necessary to effectuate the terms and conditions of this stipulation."

On July 16, 1997, a draft settlement agreement was circulated and Mr. Edwards's estate filed with the probate court two applications for approval of a settlement. One of these applications stated that "[t]he estate agrees that [Herrera-Edwards] shall receive a participation in the <u>income stream of the copyrights to be received by the estate</u> in the percentage of 37 ½ percent, net after all expenses." (emphasis added). The other application stated that Alexis Edwards

7

would receive "12 ½ percent" of a similar interest.  Both applications provided that the parties planned to enter into a standard co-publishing agreement, wherein Franson, as executor of Mr. Edwards's estate, would act as the publisher of Mr. Edwards's copyrights and would exercise complete administration rights. Herrera-Edwards and Alexis Edwards would act as co-publishers but retain no administration rights.

In the music industry, "administrative" or "administration" rights involve managing how a copyright is used in the marketplace.  The duties of a copyright administrator include registering the copyright, negotiating licensing agreements with publishing companies, and collecting and disbursing income from use of the copyrighted material.  Essentially, administration rights mean commercial control of the copyright.[1]

## E.    Settlement Agreement

On July 30, 1997, Franson, appellant Herrera-Edwards, and the other interested parties executed a settlement agreement ("Settlement Agreement"), which gave Herrera-Edwards a "37 ½ percent" interest in the "income stream from the copyrights owned by Bernard Edwards['s] Estate," as follows:

---

[1]Appellant Herrera-Edwards seeks administration rights to secure "an advance" from a publishing company and then pay off her creditors in the bankruptcy court.  An advance serves as a signing bonus paid against future royalties.  Under these agreements, the publishing company does not pay additional royalties until it recoups the amount of the advance.

8

> [Herrera-Edwards] agrees to accept and the estate agrees to take any and all steps necessary to assign a 37 ½ percent participation in the <u>income stream from the copyrights owned by Bernard Edwards['s] Estate</u> on the date of Bernard Edward[s]'s death after payment of all costs, expenses and debt related to the copyrights. The participation share of the income stream would be on a net basis after all estate, income and other taxes and administrative expenses of the estate have been paid.

(emphasis added). The Settlement Agreement gave Alexis Edwards a corresponding "12 ½ percent" interest in the "income stream from the copyrights owned by [the] Bernard Edwards Estate." Herrera-Edwards and Alexis Edwards were to receive "monthly statements while the estate . . . [was] open and quarterly statements thereafter. . . . when all estate debts and expenses have been paid."

The Settlement Agreement reiterated the parties' intent to enter into a standard co-publishing agreement and provided that "[Herrera-Edwards] and Alexis Edwards . . . <u>will have no administrative rights whatsoever regarding the copyrights</u>" of Mr. Edwards's estate. (emphasis added). Further elaborating on the interest transferred, a separate paragraph in the Settlement Agreement stated that Herrera-Edwards had no administration rights in the composition copyrights, stating:

> [Herrera-Edwards] shall have the right to assign or sell her <u>income stream</u> only to any third party. [Herrera-Edwards] acknowledges that <u>she has no administration rights in the copyrights</u> and that any third party would be subject to all terms and conditions as set forth in this agreement.

(emphasis added).

9

The Settlement Agreement also provided that the Morgan Company would receive "a 5% fee on all deferred income and other income received by the estate of Bernard Edwards from copyrights as a debt of the decedent." The Settlement Agreement was signed by all parties, including Franson, Herrera-Edwards, Alexis Edwards, each of Mr. Edwards's adult children, and the guardian for the one minor child.

Also on July 30, 1997, subject to the terms of the Settlement Agreement, Herrera-Edwards executed a general release of claims against Mr. Edwards's estate, the Morgan Company, and Mr. Edwards's six children. Herrera-Edwards also released these other parties from all contractual obligations, excepting those contained in the Settlement Agreement.

## F.    Co-Publishing Agreement

On August 21, 1997, Mr. Edwards's estate, appellant Herrera-Edwards, and Alexis Edwards entered into a co-publishing agreement ("Co-Publishing Agreement"), which assigned Herrera-Edwards a percentage of the "right, title and interest" in Mr. Edwards's composition copyrights, but expressly provided that Herrera-Edwards had no administration rights and that Mr. Edwards's estate had the "sole and exclusive right to administer, control, use, exploit, and receive income from" Mr. Edwards's composition copyrights in perpetuity:

2. Grant of Rights

(a) In consideration of all of the terms and conditions set forth herein and in the Settlement Agreement, [Edwards's estate] hereby sells, assigns and transfers to [Herrera-Edwards] thirty-seven and one-half percent (37.5%), and to Alexis Edwards twelve and one-half percent (12.5%) in and to all the [Edwards's estate]'s right, title and interest in the Compositions including, without limitation, all copyrights in the Compositions. To such effect, [Edwards's estate] shall execute and deliver assignments of copyright and other documentation which may be reasonably requested to establish and record such ownership rights.

(b) [Herrera-Edwards] and Alexis [Edwards] acknowledge that they shall have no administration rights in and to the Compositions, and that they each grant to [Edwards's estate] the sole and exclusive right to administer, control, use, exploit, receive income from, and otherwise deal in and for the Compositions, throughout the Territory, and in perpetuity.

(emphasis added).

## G.    Settlement Approval by the Probate Court

On September 4, 1997, the probate court handling Mr. Edwards's estate entered an order approving the Settlement Agreement,[2] which declared that it resolved all claims that can be made by Herrera-Edwards against the estate:

> The Court has reviewed and approved the Settlement Agreement entered into by the Estate, [Herrera-Edwards] as surviving spouse and Alexis Edwards as former spouse of the decedent. Disputed claims have been made against the estate by [Herrera-Edwards] and Alexis Edwards and the Settlement Agreement resolves all claims that can be

---

[2]Under Connecticut law, a probate court must approve estate settlements exceeding $10,000 in value and involving a minor. See Conn. Gen. Stat. §§ 45a-151, 45a-631. With the probate court's approval of the Settlement Agreement, Herrera-Edwards forfeited her right to a spousal share. See Sacksell v. Barrett, 43 A.2d 79, 81–82 (Conn. 1945) (acknowledging that the spousal share can be waived by agreement).

11

made by [Herrera-Edwards] and Alexis Edwards <u>against the estate</u>. The children of Bernard Edwards are the sole beneficiaries under his will. The children of Bernard Edwards have agreed to all terms of the Settlement Agreement and the Court believes the Agreement is fair and equitable for the children.

(emphasis added).

## H.    Copyright Assignments

Nearly three years after the probate of Mr. Edwards's estate, on January 1, 2000, Mr. Edwards's estate (through Franson as executor) and Herrera-Edwards executed and filed a copyright assignment in the United States Copyright Office. The copyright assignment granted Herrera-Edwards a 37.5% interest in the "compositions" owned by Mr. Edwards's estate, but reserved the administration rights to those compositions and imposed a perpetual lien to secure the 5% fee on gross income from their use, as follows:

> [Mr. Edwards's estate] hereby <u>sells, assigns, transfers and sets over</u> unto [Herrera-Edwards a 37.5% undivided] portion of [the estate's] <u>right, title, and interest in</u> and to <u>the musical compositions</u> . . . (the "Compositions") [owned by Mr. Edwards's estate], including . . . their titles, and lyrics . . . , <u>reserving</u>, however, <u>the exclusive right to administer, control, use, exploit[,] receive income from, and otherwise deal in and for said Compositions</u> . . . throughout the world <u>in perpetuity</u> . . . <u>and subject to a lien to secure the payment</u> to [the Morgan Company] <u>of 5% of the gross receipts from exploitation of such assigned rights in perpetuity</u>.

(emphasis added). Thus, although Herrera-Edwards received an ownership interest in the composition copyrights, Mr. Edwards's estate reserved all administration

12

rights, and Herrera-Edwards agreed that the Morgan Company had a perpetual lien on 5% of the gross receipts from administering the composition copyrights.

That same day, Mr. Edwards's estate (through Franson as executor) filed a separate assignment conveying an 8.333% ownership interest in the composition copyrights and 16.667% of the administration rights to each of the six trusts established for Mr. Edwards's children. Thus, in the aggregate, the six trusts for the children received from the estate 50% ownership of the composition copyrights and 100% of the administration rights. Mr. Edwards's six children then formed the Edwards Company to manage these interests. On January 2, 2000, the children's six trusts (through Franson as trustee) assigned their 50% copyright interests and their 100% administration rights to the Edwards Company.

After that time, the Edwards Company—through the Morgan Company as its manager—remitted quarterly payments to appellant Herrera-Edwards pursuant to the Settlement Agreement. These payments amounted to anywhere from $700,000 to $900,000 per year and continue to this day.

The Morgan Company received a 5% fee on these payments. In 2005, Herrera-Edwards protested the Morgan Company's fee with a letter from her counsel but did not pursue any legal claims against the Morgan Company at that time. As noted, the defendants-appellees in this case are the Edwards Company and the Morgan Company.

13

## I.    Bankruptcy and Adversary Proceedings

On October 17, 2012, appellant Herrera-Edwards filed a voluntary petition under Chapter 11 of the Bankruptcy Code (No. 8:12-bk-15725-KRM, Bankr. M.D. Fla.).  Within that bankruptcy proceeding, Herrera-Edwards filed a motion to reject executory portions of the Co-Publishing Agreement.  Had she not entered this agreement, Herrera-Edwards argued, she would have received a spousal share of the administration rights to Mr. Edwards's composition copyrights.  In response to Herrera-Edwards's motion to reject, the Edwards Company filed a motion for summary judgment.  The bankruptcy court heard oral argument on the motion to reject and then took it under advisement pending trial.

Also in bankruptcy court, Herrera-Edwards initiated an adversary proceeding against the Edwards Company and the Morgan Company as defendants (No. 8:13-ap-641-KRM, Bankr. M.D. Fla.).  This separate adversary proceeding sought to establish that Herrera-Edwards had also received a 37.5% interest in Mr. Edwards's artist and producer royalties and that the Morgan Company was no longer entitled to collect a 5% fee or assert a lien against her.

Thus, between her motion to reject and the adversary proceeding, appellant Herrera-Edwards asserted three claims in the bankruptcy court: (1) that she was entitled to 37.5% in administration rights in the composition copyrights; (2) that

14

she was entitled to artist and producer royalties; and (3) that the Morgan Company was not entitled to collect a 5% fee or assert a lien against her.

The bankruptcy court held a six-day joint trial on these issues.  At the conclusion, defendants the Edwards Company and the Morgan Company moved for judgment on partial findings.  See Fed. R. Civ. P. 52(c).  The bankruptcy court deferred ruling on the defendants' motion in order to permit additional briefing.

## J.    Bankruptcy Court's Post-Trial Orders

On November 2, 2016, after briefing was complete, the bankruptcy court issued its written findings of fact and conclusions of law, ruling in favor of the Edwards Company and the Morgan Company in the adversary proceeding and denying Herrera-Edwards's motion to reject in the bankruptcy proceeding.

Based on the evidence submitted at trial, the bankruptcy court found that the probate court that handled Mr. Edwards's estate had reviewed and approved the Settlement Agreement as the document governing the relationship of the parties. The Settlement Agreement, unlike the July 9th Stipulation, was signed by all relevant parties and provided for the interests of all those affected by the resolution of claims against Mr. Edwards's estate.[3]

As to the administration rights, the bankruptcy court determined that neither the Settlement Agreement nor the Co-Publishing Agreement gave such rights to

---

[3]Three of Mr. Edwards's children were not signatories to the July 9th Stipulation.

Herrera-Edwards.  The bankruptcy court noted that, even if it were to reject the executory portions of the Co-Publishing Agreement, it would not be able to rewrite the terms of the "related and otherwise binding" Settlement Agreement.  To that end, the bankruptcy court reiterated that, in the Settlement Agreement, Herrera-Edwards also acknowledged that she would receive no administration rights.

Likewise, the bankruptcy court noted that rejection does not allow the bankruptcy court to divest a right that has already vested in another party to the agreement or to undo performance that has already occurred.  See Thompkins v. Lil' Joe Records, Inc., 476 F.3d 1294, 1306, 1308 (11th Cir. 2007) (citing cases for the proposition that rejection does not affect the continued existence of a contract or function to reverse transferred interests, but rather signals that a breach has occurred).  The bankruptcy court found that the administration rights to Mr. Edwards's composition copyrights vested in the six trusts of Mr. Edwards's children, when Mr. Edwards's estate executed the copyright assignments.  In turn, the six trusts validly assigned the administration rights to the Edwards Company.

As to artist and producer royalties, the bankruptcy court concluded similarly that the Settlement Agreement did not grant these recording royalties to Herrera-Edwards.  Rather, she received only the stated percentage of the "income stream" from the composition copyrights, after the payment of all costs, expenses and related debt.  During trial, Herrera-Edwards pointed to payments and tax

16

returns from Mr. Edwards's estate during probate, which demonstrated that Herrera-Edwards received a percentage of the "net estate" and that the estate claimed a larger marital deduction.

Based on the trial evidence, however, the bankruptcy court found that the Edwards Company and the Morgan Company's witnesses offered a "plausible and credible" explanation for the differing payments while the debts of Mr. Edwards's estate were still being resolved. The bankruptcy court found that, in the face of filing deadlines and without "final documentation" available, executor Franson's representation to the Internal Revenue Service was merely his best effort at explaining the expected marital deduction of Mr. Edwards's estate, which the bankruptcy court found to be "entirely credible." The bankruptcy court also noted that the quarterly payments to Herrera-Edwards reflected only income from the composition copyrights and that, from 2000 to 2012, Herrera-Edwards never objected to these payments until filing the adversary proceeding in the bankruptcy court in 2013.

Lastly, as to the perpetual lien and the 5% fee for the Morgan Company's management services, the bankruptcy court found that the clear language of the Settlement Agreement provided for "a 5% fee on all deferred income and other income" and that the copyright assignment to Herrera-Edwards granted a lien on 5% of gross receipts from the composition copyrights. The bankruptcy court

17

concluded that Herrera-Edwards had failed to present "any evidence or case law establishing that the 5% lien is invalid or was not properly perfected." Alternatively, the bankruptcy court stated that any challenge to the fee was now time-barred because, even when Herrera-Edwards protested the fee in 2005, she failed to bring any claim against the Morgan Company until the adversary proceeding in 2013. See Conn. Gen. Stat. §§ 52-576, 52-577 (establishing a six-year statute of limitations for breach of contract and a three-year statute of limitations for tort claims).

The bankruptcy court granted the Edwards Company and the Morgan Company's motion for judgment on partial findings, denied Herrera-Edwards's motion to reject executory portions of the Co-Publishing Agreement, and entered final judgment in favor of the defendants.

Herrera-Edwards appealed the denial of her motion to reject in the bankruptcy proceeding and the bankruptcy court's final judgment in the adversary proceeding. She also filed a motion for new trial, which the bankruptcy court denied in both proceedings. Herrera-Edwards subsequently appealed those orders. On March 8, 2017, the four appeals were consolidated in the district court, which heard oral argument on August 17, 2017.

## K.    District Court's Proceedings

On November 1, 2017, the district court issued an order affirming the bankruptcy court's rulings on all grounds, including its final judgment in favor of the Edwards Company and the Morgan Company; its denial of Herrera-Edwards's motion to reject; and its denial of Herrera-Edwards's motion for new trial.

First, the district court concluded that, in advancing her arguments as to administration rights, Herrera-Edwards ignored the controlling language from the Settlement Agreement, Co-Publishing Agreement, and copyright assignments. In each of these documents, Herrera-Edwards acknowledged that the interest transferred to her did not include administration rights.  Rather, Mr. Edwards's estate retained those rights and subsequently transferred them to the six trusts for Mr. Edwards's children and then the trusts transferred them to the Edwards Company.  Therefore, Herrera-Edwards could not move to reject executory portions of the Co-Publishing Agreement in order to reclaim rights that she had never obtained.  See Thompkins, 476 F.3d at 1306.

Second, with regard to artist and producer royalties, the district court determined that Herrera-Edwards had essentially conceded that the Settlement Agreement governed and that, as established by expert testimony at trial, the common meaning of the word "copyright" did not include income from sources other than the written "compositions" themselves.  Because Herrera-Edwards had

19

failed to show any ambiguity in the Settlement Agreement, the district court concluded that, under the parol evidence rule, the bankruptcy court had properly declined to consider the July 9th Stipulation to interpret the Settlement Agreement. The district court also concluded that the conduct of Mr. Edwards's estate did not establish that the parties agreed to give Herrera-Edwards an interest in Mr. Edwards's artist and producer royalties. The district court did not address the statute-of-limitations issue posited by the bankruptcy court.

Third, the district court also affirmed the bankruptcy court's findings as to the Morgan Company's 5% fee or perpetual lien, determining that this claim against the Morgan Company was time-barred.

The district court entered final judgment in favor of the defendants-appellees, the Edwards Company and the Morgan Company. This second appeal followed.

## II.    DISCUSSION

### A.    Standard of Review

This Court serves as a "second court of review" for the bankruptcy court's judgment. In re Int'l Admin. Servs., Inc., 408 F.3d 689, 698 (11th Cir. 2005) (quotation marks omitted) (quoting In re Issac Leaseco, Inc., 389 F.3d 1205, 1209 (11th Cir. 2004)); see 28 U.S.C. § 158(d). Like the district court, we review the

bankruptcy court's fact findings for clear error.  Id.  We review legal

determinations by the bankruptcy court and district court de novo.  Id.

**B.     Administration Rights to the Composition Copyrights**

In this appeal, Herrera-Edwards argues the bankruptcy court erred by

concluding that she did not receive the administration rights to Mr. Edwards's

composition copyrights.  Herrera-Edwards contends that, because she had an

ownership interest in the composition copyrights, she necessarily had the

administration rights to them as well.  She claims that, in the Co-Publishing

Agreement, she simply delegated her administration rights to Mr. Edwards's estate,

and thus she is entitled to reject that delegation in the bankruptcy court and reclaim

her administration rights.

Under the Copyright Act, a copyright owner is defined as the owner of

"any one of the exclusive rights" listed in 17 U.S.C. § 106, which "refers to the

owner of that particular right."  See 17 U.S.C. § 101.  Section 106 states that

copyright ownership can include the "exclusive rights to do and to authorize" any

one or multiple of the following:

> (1) to reproduce the copyrighted work in copies or phonorecords;
>
> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) to distribute copies and phonorecords of the copyrighted work to
> the public by sale or other transfer of ownership, or by rental, lease, or
> lending;

21

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to <u>perform</u> the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to <u>display</u> the copyrighted work publicly; and

(6) in the case of sound recordings, to <u>perform</u> the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106 (emphasis added). At the same time, the Act provides that ownership of a copyright "may be transferred <u>in whole or in part</u> by any means of conveyance or by operation of law" and that the exclusive rights that make up ownership "may be transferred [<u>in whole or in part</u> by any means of conveyance]" and may be "<u>owned separately</u>." 17 U.S.C. § 201(d) (emphasis added).

In this case, Mr. Edwards's estate transferred in part an ownership interest in Mr. Edwards's composition copyrights to Herrera-Edwards, which did not include administration rights. <u>Id.</u> Instead, the administration rights were carved out and retained by Mr. Edwards's estate, transferred to the trusts of his six children, and are thus "owned separately" for purposes of the Copyright Act. <u>Id.</u> In one way or another, the Settlement Agreement, Co-Publishing Agreement, and copyright assignment all explicitly state that Herrera-Edwards had no administration rights to Mr. Edwards's composition copyrights.

22

Under the Settlement Agreement, for example, the parties agreed that Herrera-Edwards would have "no administrative rights <u>whatsoever</u> regarding the copyrights." (emphasis added).  The Co-Publishing Agreement provided similarly that Herrera-Edwards would have "no administration rights."[4]  Even the copyright assignment transferring the interest to Herrera-Edwards specified that Mr. Edwards's estate expressly "<u>reserv[ed] . . . the exclusive right to administer,</u> control, use, exploit[,] receive income from, and otherwise deal in and for said <u>Compositions</u>."  (emphasis added).

In essence, Herrera-Edwards received a property interest in Mr. Edwards's composition copyrights, including an "income stream" from their use and licensing, but she never received any right to control how these copyrights would be used or licensed.

Herrera-Edwards cannot demonstrate that she ever received administration rights, and thus she has not shown that the bankruptcy court erred by denying her motion to reject portions of the Co-Publishing Agreement.  See Thompkins, 476 F.3d at 1306.  After the Settlement Agreement, Mr. Edwards's estate transferred the copyright administration rights to the trusts of Mr. Edwards's six children,

---

[4]Herrera-Edwards focuses on the word "grant" in the Co-Publishing Agreement to suggest that she somehow received administration rights.  But, taken in context, that language was just another way of saying that Herrera-Edwards "acknowledge[s] that [she] shall have no administration rights in and to the Compositions."  Indeed, even assuming arguendo that Herrera-Edwards did receive administration rights from the Co-Publishing Agreement, she granted them in perpetuity back to Mr. Edwards's estate in the same sentence.  See Thompkins, 476 F.3d at 1306, 1308.

which vested upon assignment.  See 17 U.S.C. § 201(d).   A motion to reject

cannot be used to strip another party of a vested interest.  See Thompkins, 476 F.3d

at 1307 (explaining fully executed portions of an agreement cannot be rejected);

see also In re the Ground Round, Inc., 335 B.R. 253, 261 (B.A.P. 1st Cir. 2005)

("[R]ejection does not change the substantive rights of the parties to the

contract . . . ." (citation omitted)).  Accordingly, we affirm the district court's

ruling on this issue.

## C.    Artist and Producer Royalties

Herrera-Edwards also argues that the bankruptcy court erred in concluding

that she was not entitled to a share of Mr. Edwards's artist and producer royalties.

Herrera-Edwards once again points to the July 9th Stipulation, the payments she

received during the probate of Mr. Edwards's estate, and the tax returns filed by

Edwards's estate before the Settlement Agreement was executed.  As to the

limitations period, Herrera-Edwards contends that each quarterly payment lacking

artist and producer royalties constituted a separate breach by the defendants and

thus resulted in a separate claim accruing at that time.

As Herrera-Edwards points out, the July 9th Stipulation does refer to a

percent interest in "all royalties and other payments received from the copyrights

and other such interests owned by Bernard Edwards at the time of his death."

(emphasis added).  However, the subsequent Settlement Agreement ultimately

24

signed by Herrera-Edwards, and later approved by the probate court, circumscribed Herrera-Edwards's interest to only "the income stream <u>from the copyrights owned by Bernard Edward['s] Estate</u>."  (emphasis added).  By its terms, the Settlement Agreement clearly limits Herrera-Edwards's interest to only the copyrights owned by Mr. Edwards's estate—namely, the composition copyrights.  As discussed above, Mr. Edwards did not own the recording copyrights to his compositions, and thus the Settlement Agreement did not grant Herrera-Edwards an interest in the income related to those recording copyrights.  Furthermore, the general release, signed along with the Settlement Agreement, relieved the parties of all other preceding contractual obligations.

The Co-Publishing Agreement and copyright assignments provide additional evidence of what Herrera-Edwards received under the Settlement Agreement. These documents transferred a percentage of the "right, title and interest in" Mr. Edwards's written "<u>compositions</u>" to Herrera-Edwards.  The interest transferred, and thus the applicable "income stream," related to the written "compositions" owned by Mr. Edwards's estate.  Moreover, trial testimony in the bankruptcy court established that a "copyright in a composition generally refers to the words and music" rather than to artist and producer royalties.

As to Herrera-Edwards's other arguments, the payments made during probate were consistent with the Settlement Agreement, as well as the necessity to

settle "all estate debts and expenses" prior to issuing quarterly payments.  The

bankruptcy court found that the Edwards Company and the Morgan Company's

witnesses offered a "plausible and credible" explanation for these "net" payments

while settling the debts of Mr. Edwards's estate.  The bankruptcy court also found

that Franson's explanation for claiming a larger marital deduction was "entirely

credible."  Herrera-Edwards has not demonstrated clear error in the bankruptcy

court's credibility determinations on these issues.[5]  See In re Int'l Admin. Servs.,

Inc., 408 F.3d at 698.  Thus, we affirm the district court's ruling.

## D.    The Morgan Company's 5% Fee and Perpetual Lien

Herrera-Edwards further argues that the bankruptcy court erred in finding

that the Morgan Company holds a valid perpetual lien on 5% of the gross income

due to her under the composition copyrights.  She claims that the Settlement

Agreement permitted the 5% fee against only the income of Edwards's estate,

which has been closed for over a decade, and that the Morgan Company no longer

provides a service significant enough to justify its lien or fee.

The 1997 Settlement Agreement specified a 5% fee as to the "deferred

income and other income received by the estate of Bernard Edwards from

copyrights." (emphasis added).  Subsequently, however, the estate's 2000

copyright assignment to Herrera-Edwards expressly provided that her income

---

[5]In any event, Herrera-Edwards's royalty claim is likely time-barred.  See Conn. Gen.
Stat. §§ 52-576, 52-577.

interest was "subject to a lien to secure the payment to [the Morgan Company] of 5% of <u>the gross receipts from exploitation of such assigned rights in perpetuity</u>." To the extent that there is arguably some conflict, Herrera-Edwards ignores that the bankruptcy court conducted a six-day trial and found that Herrera-Edwards failed to present "evidence or case law establishing that the 5% lien is invalid or was not properly perfected."[6]  Given the documents and the trial record, we cannot say that the bankruptcy court erred in its ultimate findings and conclusion in this case.

## III.   CONCLUSION

For all of these reasons, we affirm the district court's final judgment upholding the bankruptcy court's orders, which denied Herrera-Edwards's motion to reject in the bankruptcy proceeding, granted judgment in favor of the defendants in the adversary proceeding, and denied Herrera-Edwards's motion for new trial.

**AFFIRMED.**

---

[6]In any event, Herrera-Edwards's claim against the perpetual lien and the 5% fee is likely time-barred.  <u>See</u> <u>Conn. Gen. Stat.</u> §§ 52-576, 52-577.  As the bankruptcy court posited, in 2005, Herrera-Edwards protested the perpetual lien and the 5% fee on her quarterly payments but yet did not pursue a claim.